J-S55001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: O.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1591 EDA 2018 |

Appeal from the Decree April 25, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000250-2018,
FID: 51-FN-340767-2009

BEFORE:  OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 05, 2018**

O.A. ("Father") appeals from the decree dated and entered April 25, 2018, granting the petition filed by the Philadelphia Department of Human Services ("DHS" or the "Agency") seeking to terminate involuntarily his parental rights to his minor child, O.A., a male born in September of 2001, ("Child"), with M.V. ("Mother"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b).[1]  We affirm.

---

[1] In a separate decree dated and entered April 25, 2018, the trial court also involuntarily terminated the parental rights of Mother and any putative father to Child pursuant to section 2511(a)(1), (2), (5), and (b) of the Adoption Act. Neither Mother nor any putative father is a party to this appeal, nor has either individual filed a separate appeal.

On March 28, 2018, the Agency filed petitions to terminate involuntarily the parental rights of Father and Mother to Child. On April 25, 2018, the trial court commenced an evidentiary hearing on the petitions. Mother's counsel, Attorney Harry Levin, was present, but Mother was not present. Father's counsel, Attorney Jay Stillman, was present, but Father participated via telephone from SCI - Retreat, where he was incarcerated. N.T., 4/25/18, at 10-13. Child was present and testified as to his preferred outcome. Attorney Edward Louden represented Child as his legal counsel, and Attorney Nghi Vo, represented Child as his guardian *ad litem* ("GAL").[2]

The Agency presented the testimony of Child; Lashay Hickenbottom, the Northeast Treatment Center ("NET") Community Umbrella Agency ("CUA")

---

[2] In **In re Adoption of L.B.M.**, ___ Pa. ___, 161 A.3d 172 (2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. In **In re T.S.**, 2018 Pa. LEXIS 4374 (filed August 22, 2018), ___ Pa. ___ ,___ A.3d ____ (2018), the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." **Id.** at ___, 2018 Pa. LEXIS 4374 at *27-28. Here, Child had both a legal counsel and a GAL, and his preferred outcome is part of the record, so the mandates of **L.B.M.** and **T.S.** are satisfied as to ascertainment of the child's preferred outcome.

case manager; C.I., Child's foster mother ("Foster Mother"); F.I., Child's foster father, ("Foster Father") (collectively, "Foster Parents"); Sharena Gatling, a caseworker from Community Behavioral Health assigned to the family; and Nick Valotta, the Court-Appointed Special Advocate ("CASA") for Child.

DHS first presented the testimony of Child. Child, who was sixteen years old at the time of the hearing, testified that he was living with Foster Parents, that he loved living with them, and that he was happy. *Id.* at 10, 15, 17. Child testified that Foster Parents had been neighbors of his family. *Id.* at 15. Child testified that he had not seen his parents in the fifteen months preceding the hearing while he was living with Foster Parents, nor had he wished to see either parent. *Id.* at 16. Child stated that Foster Father takes him to his medical appointments, that Foster Mother helps him with his homework, and that both Foster Parents attend teacher conferences with him. *Id.* He also stated that, if he woke up in the middle of the night and was having a bad dream, he would want Foster Mother to comfort him. *Id.* at 16-17. Child testified that he desired to have the parental rights of Father and Mother terminated so that Foster Parents could adopt him. *Id.* at 17. Child stated that Foster Parents have a stable family and he feels safe with them. *Id.* They support him emotionally and financially. *Id.* Child loves them and wants to be with them, and he does not want a relationship with Father or Mother. *Id.*

On the record, Child testified, when questioned, as follows:

CHILD: My dad and mom has [sic] a drug and alcohol addiction. My dad – me and my dad never really had a connection or, like, a father and dad [sic] relationship. He's always been in and out of jail.

The only person I did live with was my mom, and she had a drug and alcohol problem and she wasn't there for me. She would verbally abuse me and physically abuse me throughout my, like, school.

When I needed help, I would go to my best friend's family's house because I knew that I could trust them. I knew I could have came [sic] to them for everything.

Like, if I needed help with school, if I needed money, they would have gave [sic] it to me. Like, if I needed help because -- a situation on New Year's Eve where she choked me and she kicked me out. I went to them.

So, I just feel like living with them would be the best opportunity for me, for my future and present, and I just don't want (unintelligible).

MS. HOLLAND: Okay. When you said your best friend's family, is that the [Foster Parents?]

CHILD: Yes.

MS. HOLLAND: -- family that you're referring to?

CHILD: [Foster] family.

MS. HOLLAND: What are some of the things that you want for the future?

CHILD: I want to finish high school. I want to go to college.

MS. HOLLAND: Do you have any ideas of what you want to do in college?

CHILD: Education, nursing.

MS. HOLLAND: You want to be a teacher?

CHILD: Yes.

MS. HOLLAND: That's great.  Is there anything else that you are having right now that we could help you with?

CHILD: What do you mean?

MS. HOLLAND: Like, is there anything that you need in their home that you're not getting at this moment?

CHILD: No, I could save (ph) everything I need.

MS. HOLLAND: You have everything you need?

CHILD: Yes.

MS. HOLLAND: Well, you're very brave, and we appreciate you.  I have—

CHILD: Thank you.

MS. HOLLAND: No further questions.

THE COURT: Anything, Mr. Vo?

MR. VO: No, I have no questions.

THE COURT: Mr. Stillman, anything for –

MR. STILLMAN: Just briefly.  Yeah, [Child], if your father – when he does get out of jail, would you have any problem seeing him or visiting with him?

[CHILD] No, but I wouldn't want to.

MR. STILLMAN: No further questions.

THE COURT: Anything, Mr. Levin?

MR. LEVIN: No questions, Your Honor.

MS. HOLLAND: I just want to get clarity.  You said no, but what you then said was that you don't want to.  So, if your dad is

released from jail, would you want to have a relationship with him?

CHILD: I never had a relationship with him, so, why would I want to start one?

MS. HOLLAND: Okay.

N.T., 4/25/1, at 16-20.

DHS then questioned the CUA caseworker, Ms. Hickenbottom, who testified that the family came into DHS services on January 1, 2017, on New Year's Day, when Child indicated that Mother had touched him inappropriately. *Id.* at 22. At that time, DHS obtained an order of protective custody ("OPC"), and Child has remained in care since that date. *Id.* DHS established single case plans ("SCP") for both parents throughout the lifetime of the case, and both Father and Mother were invited to participate in the SCP meetings. *Id.* at 22. With regard to Mother, Ms. Hickenbottom testified that it would be in the best interest of Child to change Child's permanency goal to adoption. *Id.* at 24-25.

Ms. Hickenbottom testified that Father has been incarcerated for the majority of the case, if not the entire life of the case, and Father was aware that Child was in DHS care. *Id.* at 25. When Father's counsel objected to the testimony that Father was aware that Child was in care, Ms. Hickenbottom testified that Father was sent copies of the petition to adjudicate Child dependent and the SCPs throughout the life of the case. *Id.*

Counsel for DHS requested the court to take judicial notice that, throughout the life of the case, DHS has made reasonable efforts, and the court has always found reasonable efforts, to reunify Child with Father. *Id.* at 27. At the adjudicatory hearing, Father, who was then incarcerated at SCI-Graterford, was represented by counsel. *Id.* Judge Fernandes found that DHS had made reasonable efforts to make Father aware that Child was coming into care, and that Father was aware of that fact. *Id.* The trial court overruled the objection to Ms. Hickenbottom's testimony that Father was aware that Child was in care. *Id.* at 27-28.

Ms. Hickenbottom testified that the SCP objectives for Father had remained the same throughout the life of the case. *Id.* at 28. She testified that Father's objectives were to write letters and make phone calls, as allowed, while in prison, per court order. *Id.* at 28-29. When released from jail, Father was to follow the court order and present at the Clinical Evaluation Unit ("CEU") forthwith and schedule an assessment to evaluate his need for treatment of dual diagnosis symptoms, to address concerns regarding possible mental health issues and suspected substance abuse. *Id.* at 29. Ms. Hickenbottom further testified that, per the court order, Father was to have three random tests, and was to follow all recommendations of the CEU evaluation. *Id.* Ms. Hickenbottom testified that Father has been incarcerated throughout the life of this case. *Id.* Child has never asked to visit Father in jail. *Id.* at 30. Ms. Hickenbottom testified that Father had not contacted DHS

to find out how Child was doing in school or to ask about Child's medical appointments. *Id.* at 33. Ms. Hickenbottom also testified that, throughout the life of this case, Father has not completed drug and alcohol treatment while incarcerated and has not completed his parenting or employment objectives. *Id.* at 33-34. DHS has sent SCPs to Father, and he was made aware of his objectives. *Id.*

Ms. Hickenbottom testified that Father was scheduled to be released from incarceration as early as May of 2018, and that he had no appropriate housing or employment. *Id.* at 34-35. Child reported to Ms. Hickenbottom that Father planned to move back in with Mother upon his release, although she does not wish to be involved in this case. *Id.* at 35, 40. Ms. Hickenbottom testified that it was in Child's best interest to terminate Father's parental rights, and that Child will not suffer any irreparable harm as a result. *Id.* at 36. Ms. Hickenbottom believed that there would be irreparable harm to Child if Father's parental rights were not terminated. *Id.* at 37. Ms. Hickenbottom does not believe that there is a healthy paternal relationship between Child and Father. *Id.* Father has not complied with his parenting objectives, and has not achieved any of his objectives. *Id.* Ms. Hickenbottom last saw Child in Foster Parents' home on April 9, 2018, and she observed that Child was safe and his basic needs were being met. *Id.* at 38. Child is in Foster Parents' home through A Second Chance. *Id.* Child really loves Foster Parents' home, and Foster Parents are very supportive of him. *Id.* At the time of the hearing,

Child attended tenth grade, and had very good grades. *Id.* at 38. The prior caseworker referred Child to Achieving Independence Center ("AIC") to assist him in obtaining scholarships for college. *Id.* at 39.

Ms. Hickenbottom believes that Child is bonded to Foster Parents. *Id.* She testified that Foster Parents' home is the best and safest home for him, and Child can rely on Foster Parents and has positive interactions. *Id.* at 39-40. Child's best friend lives in Foster Parents' home, and Ms. Hickenbottom observed that Child is comfortable in Foster Parents' home. *Id.* at 40. Child had reported that he was unhappy in his parents' home. *Id.* Child has a relationship with his sister. *Id.* Ms. Hickenbottom's only contact with Father consisted of writing him a letter informing him of the termination hearing, and exploring whether he was interested in voluntarily relinquishing his parental rights to Child. *Id.* at 41.

Father testified that, since learning Child was in the custody of the Agency, he had written to Child and to Foster Parents numerous times to see if he could call Child, but had not received any response. *Id.* at 43. Father made no effort to contact the Agency. *Id.* at 44. Father received a package from NET, and had been made aware of the Family Service Plan for Child. *Id.* Father testified that, while in prison, he had completed the Alcohol and Other Drug ("AOD") program, which is an outpatient drug program, and he had completed violence prevention training. *Id.* at 45. He was scheduled to be released on parole on May 10, 2018, and was going to be employed and live

in Reading, Pennsylvania, where he would live in a studio apartment where he would serve as the maintenance man. *Id.* at 46-47. Father did not wish to give up Child for adoption, as he did not believe any parent should give up a child unless the parent does not love the child. *Id.* at 48. Father testified that he had custody of Child and his sister in the past, in 2006 or 2008, that he fought to get Child "out of the system," and that he turned the children over to Mother when she was doing well. *Id.*

Father acknowledged his lengthy criminal record, and testified that he had been in prison, most recently, for six years. *Id.* at 49. Father stated that, if he stays away from drugs and bad influences, and does not make bad decisions, he would remain out of prison in the future, and focus on his parole. *Id.*

On cross-examination by the Agency, Father admitted that he had not completed a parenting class, and that he had been in and out of jail for 30 years. *Id.* at 52. When he did regain custody of Child, he gave custody of Child to Mother, because he thought she was doing well. *Id.*

On cross-examination by the GAL, Father testified that he has no intention of leaving Reading after he moves to Reading, and that he has no need to go back to Philadelphia, because he "has nothing there." *Id.* at 53.

On April 25, 2018, the trial court entered the decrees involuntarily terminating the parental rights of both Father and Mother to Child. On May

25, 2018, Father timely filed a notice of appeal and concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises the following issues:

1. Whether the [t]rial [c]ourt erred in [t]erminating [A]ppellant's [p]arental [r]ights under 23 Pa.C.S.A. section 2511(a)(1), the evidence having been insufficient to establish Appellant had evidenced a settled purpose of relinquishing his parental rights claim, or having refused or failed to perform parental duties [?]

2. Whether the the [sic] evidence was sufficient to establish that Appellant had refused or failed to perform parental duties, caused Child to be without essential parental care, that conditions having led to placement had continued to exist, or finally that any of [the] above could not have been remedied[?]

3. Whether the [e]vidence was sufficient to establish that [t]ermination of [p]arental [r]ights would best serve the [n]eeds and [w]elfare of the [m]inor [c]hild, under 23 Pa.C.S.[A.] section 2511(b)[?]

Father's Brief at 5.[3]

Father argues that there was insufficient evidence presented at the termination hearing to show that the requirements of section 2511(a)(1) were met by clear and convincing evidence. Father asserts that, although incarcerated, once he learned that Child had entered into placement, he made efforts to connect with Child. Father's Brief at 8. Accordingly, Father contends that he did not have a settled purpose to relinquish his parental rights. With regard to section 2511(a)(2), Father also argues that there was little to demonstrate that he was lacking the ability to parent a 16-year-old. *Id.*

---

[3] While Father stated his issues somewhat differently in his concise statement, we find them sufficiently preserved for this Court's review.

Father claims that he successfully completed a number of programs while in prison, and that he had a residence and a full-time job lined up upon his release from incarceration. *Id.* at 9. Father thus asserts that DHS failed to meet its burden of proving that he was unable to provide care for Child.

Regarding section 2511(b), Father contends that the termination of his parental rights cannot be sustained where Child's needs and welfare have not been properly addressed. *Id.* Further, he asserts that section 2511(b) cannot serve as an independent basis for the termination of his parental rights. *Id.*

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other

- 12 -

hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" ***Id.***, *quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider section 2511(a)(1), (2) and (b). Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To terminate parental rights pursuant to Section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties.  ***In Re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to subsection 2511(a)(1), our Supreme Court has held:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).  Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity.  The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting*
> *In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Our Supreme Court has addressed the termination of parental rights of incarcerated parents under section 2511(a)(2), stating:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and [ ] the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d at 828.

In *Adoption of S.P.*, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that he abandoned his child.

> Applying [*In re Adoption of McCray*, [331 A.2d 652, 655 (Pa. 1975)] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [*McCray*] at 655.
> * * *

Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Adoption of S.P.*, 47 A.3d at 828, *quoting **In re: Adoption of McCray***, 331 A.2d at 655) (footnotes and internal quotation marks omitted). Also in *Adoption of S.P.*, our Supreme Court re-visited its decision in *In re R.I.S.* and stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re:*] *E.A.P.*, 944 A.2d [79,] 85 [(Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d at 830–831.

As the Supreme Court definitively ruled in *Adoption of S.P.*, the trial court may examine the effect of a parent's incarceration in ruling on a termination petition.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." **In re Z.P.,** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." **In re K.Z.S.**, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

On the record, the trial court stated as follows:

**THE COURT:** So, with respect to this case, I am going to start by finding [Child] credible and the CUA worker credible - - completely credible. With respect to [F]ather, I am not going to find [F]ather completely credible.

I will find [F]ather credible as to the programs he completed in prison, and I will find [F]ather credible as to his expressed love

- 19 -

for his son. I will not find [F]ather credible as to efforts he made to establish contact with his son.

Specifically, as to [F]ather, I am going to terminate, pursuant to [§] 2511(a)(1) and (a)(2). I do not believe that the Department has met a burden of proof with respect to [§§] 2511 (a)(5) and (a)(8).

With respect to [§] 2511(a)(1), it indicates that the parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] either has evidenced settled purpose of relinquishing parental control - - parental claim to a child or has refused or failed to perform parental duties.

By [F]ather's own testimony, not once did he reach out to CUA to attempt to maintain contact with his child. He indicated that he received documentation from CUA, but he did not reach out to CUA.

I don't find [F]ather credible as to sending cards to a sister to try to get it to her brother or anything of that sort. Father was provided information from CUA as to how he could get his child back and who he could work with to get his child back.

With respect to [§] 2511(a)(2): "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child [to] be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parents."

I understand [F]ather's counsel's argument that [F]ather is scheduled to be released from prison shortly. However, DHS Exhibit B indicates that [F]ather has a long history of incarceration dating back to 1988, long before his son was even born.

So [F]ather has been in and out of prison and that, in and of itself, has made him unable to parent this child or establish a real relationship with his child.

And, so, the fact that [F]ather is going to be released from prison shortly does not do anything to allay any concerns that this

[c]ourt may have that [F]ather wouldn't find himself incarcerated again very shortly.

I also find it very telling, as the Department pointed out, that when asked what reasons he would have to be in Philadelphia, [F]ather couldn't find one, despite the fact that his son is currently residing in Philadelphia and in Family Court, and, in fact, here today having a termination regarding that.

So, I think [F]ather has demonstrated by his own testimony that he does not have a real relationship with his son, and[,] in fact, he is only usurping rights to a child that he has no relationship with.

With respect to section 2511(b), whether there would be a father-child relationship, [F]ather testified himself that there's no real relationship. He's been in and out of prison. He acknowledged that.

He's made poor decisions throughout the life - - his life and his son's life - - that[,] when he had the opportunity to keep his son, he gave his son back to [ ] [M]other[,] and his son subsequently ended up back in DHS care.

And, in fact, he indicated that he wants - - he has not been there for this child. I quote - - [F]ather specifically said - - he acknowledged that he had not been there for his son.

Father acknowledged that he learned that his son was in foster care last year sometime.

Based on [Child's] testimony, the child, he's testified, and I find him completely credible, that he has no relationship with his father, that his father has been in and out of his life, due to [Father's] being in and out of prison, and that he does not feel that he has a father-son relationship, and that he himself does not believe there would be any irreparable harm if his father's rights were terminated.

Above all of the testimony provided today, that is the most compelling testimony. That is the most compelling proof that there is not a parent-child relationship here, and, as such, I find that there would be no detrimental impact.

There is no father-son relationship. So, I am going to terminate Father's parental rights pursuant to [§§] 2511(a)(1), (a)(2), and (b).

**MS. HOLLAND:** Can I ask, Your Honor, just about (a)(5) specifically, just so I know what we had not met in (a)(5)?

**THE COURT:** With respect to (a)(5), this child was not removed from [F]ather's care. He was

**MS. HOLLAND:** Okay.

**THE COURT:** -- removed from [M]other's care. He was only removed 11 months ago. Father was incarcerated at the time, and so, as such, he could not have been removed from his [f]ather's care.

And so, [§§] 2511(a)(5) [and] (a)(8) do[] not apply to [F]ather.

**MS. HOLLAND:** Okay.

\* \* \*

As stated by [Child's] attorney, Mr. Louden, he is 16 years old and very much able to make a decision of this magnitude.

N.T., 4/25/18, at 59-66.[4]

After a careful review of the record, this Court finds the trial court's decision to terminate the parental rights of Father under sections 2511(a)(1), (2), and (b) is supported by competent, clear and convincing evidence in the record. ***In re Adoption of S.P.***, 47 A.3d at 826-827. The trial court

---

[4] The trial court did not write an opinion setting forth the facts, procedure, and a discussion of this matter. Rather, the trial court filed a document entitled "Trial Court's Notice of Compliance with Rule of Appellate Procedure 1925(a)," in which it stated that it applied the facts to the law, set forth its credibility determinations, and provided that the reasons for terminating Father's rights are set forth on the record at N.T., 4/25/18, at 59-66.

appropriately considered Father's incarceration in addressing the evidence admitted to support the termination of his parental rights, and the fact that Father has been in and out of incarceration for almost all of Child's entire sixteen-and-one half-year life. When Father did regain custody of Child from DHS at a time when Father was not incarcerated, he gave custody of Child to Mother. The trial court also found that Father failed to maintain communication with Child. The trial court appropriately considered that Child's needs and welfare, as well as his safety needs, have never been met by Father, but, rather, by Foster Parents. The trial court also appropriately considered that Child, himself, stated that he has no bond with Father, nor does he desire to have one, and that his preferred outcome is to be adopted by Foster Parents. *In re T.S.M.*, 71 A.3d at 267; *In re K.Z.S.*, 946 A.2d at 763. Further, although Father claims he loves Child, this Court has held that a parent's love of his child, alone, does not preclude a termination. ***See In re L.M.***, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007, *citing **In re Z.S.W.***, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.").

Accordingly, we find no abuse of discretion in the trial court's termination of Father's parental rights to Child pursuant to sections 2511(a)(1), (2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/18